JOURNAL ENTRY AND OPINION
Defendant Steve Vlahopoulos appeals from his convictions for rape and corruption of a minor. For the reasons set forth below, we affirm in part, reverse in part, and remand for re-sentencing.
On September 16, 1999, defendant was indicted pursuant to an eight count indictment. In Counts One and Two, the state charged defendant with raping his twenty year-old niece. In Counts Three, Four, Five and Six, the state charged defendant with raping his sixteen year-old niece. Counts One through Six each contained sexually violent predator specifications and repeat violent offender specifications which alleged that in September 1991, defendant was convicted of felonious assault. In Count Seven, the state charged defendant with corrupting another with drugs, and in Count Eight, the state charged him with corrupting a minor with drugs. Defendant pleaded not guilty to all charges and the matter proceeded to a jury trial on June 5, 2000.
For its case, the state presented the testimony of the twenty year-old and the sixteen year-old.
The twenty year-old testified that her date of birth is April 17, 1979. Defendant is her father's brother and is approximately twenty years older than she. He lives in a two family house on Franklin Avenue and her grandparents live upstairs. The woman further testified that she lived with her parents and worked at the family's restaurant. She said that she liked to go dancing, but was permitted to go out only when defendant or another trusted adult was also present.
The woman testified that on one occasion, she and defendant went to Sophia's Restaurant to see one of defendant's friends. Defendant then drove her to the Tick Tock Lounge in Cleveland. She stated that prior to this time, she had never had alcohol, but defendant said that it was fruity and she should drink it. She consumed five or six drinks, felt dizzy, and when they left the bar, she twisted her ankle.
The woman was unable to drive and defendant did not want to drive her home. They returned to defendant's home. Defendant massaged her ankle then began to massage her leg. She told him to stop and he became angry. Later, as she dozed off, defendant touched her breasts and touched her vaginal area. (Tr. 396) She did not testify that penetration occurred, however. The woman stated that she was afraid to tell her family because she feared that they would not believe her or that it would tear the family apart.
She admitted that she continued to go out in groups with defendant but she testified that it was her father's rule that if she went out, her uncle had to be present.
The woman further testified that in June of 1999, as they were preparing to go out, defendant called her into his bedroom, offered her cocaine and gave her a straw. She refused the cocaine, but felt extremely pressured. Defendant told her they were not leaving until she consumed the cocaine, then he grabbed her arm and showed her how to snort it. She stated that she snorted it so that they could leave (Tr. 410), and that she obeyed her uncle and did not question him. (Tr. 413). Over the next three months, she used cocaine with her uncle approximately fifteen times.
In June 1999, the group again went out. The woman consumed alcohol and cocaine and became sick to her stomach. They returned to defendant's home and she and her cousin Penny laid on defendant's bed. Penny left and defendant got on top of her. She felt ill and could not push defendant away. She testified that defendant put his fingers into her vagina. (Tr. 419). On another occasion, she again became ill after drinking alcohol and snorting cocaine with her uncle and cousins. She went to sleep in one of the bedrooms of defendant's apartment. At this time, defendant performed oral sex on her and penetrated her. (Tr. 421).
In July 1999, the woman again felt ill after drinking with defendant and her cousins and she rested at defendant's apartment. At this time, defendant attempted to penetrate her with an object. (Tr. 431).
The woman testified that she was afraid of defendant because he is very violent and beat his former wife.
Defendant's sixteen year-old niece testified that she was born on August 15, 1981. Her mother is defendant's sister and her family lives in Baltimore. The girl testified that during her Christmas break from high school in 1997, she was staying at her grandmother's home on Franklin Avenue. Defendant asked the girl if she wanted to go out with him. He took her to the Tick Tock Tavern where she consumed six or seven drinks and became intoxicated.
Defendant helped her into his van then parked behind a building. He began to rub her leg, then pulled her pants down and inserted his penis into her. The girl stated that defendant's hands were on her shoulders and she did not have enough strength to push him off. He told her that he was willing to go to jail for what he had done and that if she told anyone he would harm her family. He then took her back to her grandmother's house.
The girl stated that she went out with defendant again on December 24, 1997, because she was afraid. He drove to a dark alley, gave her cocaine, showed her how to do it and told her that it would make her feel better. She did not want the drug and cried but he insisted that it was good, pure, like aspirin, and would give her energy. She snorted the cocaine and they then went to the Tick Tock Tavern. Defendant obtained three or four drinks for the girl. She became intoxicated and they then returned to the Franklin Avenue home. Other family members were present and the girl went to sleep.
She further testified that over the following seven days, she went out with defendant and consumed cocaine every night. She testified that the cocaine made her feel energetic, freer and affected her decision-making, causing her to make choices which she would not ordinarily make. (Tr. 631). The girl testified that defendant told her not to say anything to anybody and that if she did, he would harm her family. (Tr. 632). She testified that she did as her uncle told her and that she was scared. (Tr. 626).
The following month, defendant visited her in Baltimore and they engaged in sexual intercourse after he gave her cocaine or cocaine and alcohol.
She returned to Cleveland for Easter of 1998. Defendant picked her up from the airport and took her to a hotel. He gave her cocaine and they engaged in sexual intercourse. She stated that she believed that the experience would be more painful without the drug, (Tr. 643), and that the drug served to numb her to the pain. (Tr. 662). Defendant told the girl that he is powerful and that he would take care of people and she therefore feared for her family. (Tr. 644).
By the summer of 1998, defendant and the girl decided that she would work in Cleveland for the summer and she stayed at the Franklin Avenue home. Over the next eight weeks, she consumed cocaine with defendant approximately forty times then engaged in sexual acts with him.
The girl again returned to Cleveland during the summer of 1999. Defendant gave her cocaine and alcohol and they engaged in sexual intercourse. She stated that intercourse was painful if she did not snort cocaine beforehand.
The girl eventually told a male friend about her relationship with defendant and the friend then told the girl's mother.
The state also presented the testimony of Cleveland Patrol Officer Christine Oravec. Oravec testified that she took the initial interview and that the girls seemed upset. She also stated that defendant was not immediately arrested because the complainants claimed that he had weapons in the house and intended to flee. (Tr. 814). Oravec admitted on cross-examination that the case proceeded upon the word of the complainants, i.e., without rape kits or other corroboration, but upon redirect, she stated that she concluded that the complaint was valid and referred the matter to the sex crimes unit for investigation. (Tr. 819-820).
Det. Lori Parker of the sex crimes unit testified that she conducted separate follow-up interviews with the complainants. Parker also attempted to interview defendant's daughter Penny, who was sometimes present when the girls were at the Franklin Avenue home. Parker said that Penny arrived with a friend named Anna, but the women were not cooperative. Ultimately, Parker asked them to leave and did not obtain statements from them. Finally, Parker stated that a plain clothes unit arrested defendant because of the allegations that there were guns in the apartment. (Tr. 840).
On cross-examination by defendant's trial counsel, Parker was asked whether defendant had made a statement, and she indicated that he had exercised his right to counsel. (Tr. 847). She also admitted that no contraband was found at the home. (Tr. 849). Upon further cross-examination as to the nature of her follow-up investigation, Parker indicated that she became concerned for the well-being of defendant's young granddaughter who resided with him but she did not know the final outcome of an investigation performed by Children and Family Services. (Tr. 847).
Defendant elected to offer evidence and presented the testimony of Alex Vlahopoulos, Dennis Barrett, Penelope Buckner, Penelope Vlahopoulos and Anna Collins.
Defendant's sixteen year-old son, Alex Vlahopoulos, testified that from June 1999 to August 1999, he spent almost every day at his dad's apartment on Franklin Avenue. He stated that he and his cousins smoked marijuana there on a regular basis, but that defendant was unaware of this drug use. On cross-examination, however, Alex admitted that he had written in his journal about having sex with his father's girlfriend.
Dennis Barrett, a bartender at the Tick Tock Tavern, stated that he knows defendant well and has met his nieces. Barrett denied serving alcohol to defendant's nieces and also denied that defendant obtained alcohol for them. He admitted, however, that he does not work every day.
Defendant's daughter, Penelope Buckner, stated that in 1996 and 1997, she lived in the upstairs of the Franklin Avenue home with her grandmother. She moved back into the apartment in January of 1998, during the break up of her marriage and moved in permanently in June 1999. Buckner claimed that defendant and his brother, the father of one of the complainants, had a business dispute involving the ownership of a restaurant that they had purchased.
Buckner further testified that defendant took her and her cousins out for Greek dancing and the cousins then slept at her father's apartment. She stated that she was there whenever the complainants visited and she denied that anything improper had occurred. Rather, according to Buckner, defendant has always watched over the girls to determine whether they associated with good people.
On cross-examination, Buckner admitted that strippers lived at the apartment, and that Children's Services had conducted an investigation regarding her daughter and allegations that Buckner sold guns and was a drug dealer. (Tr. 991). She also admitted that, despite her claims of defendant's concerns that the family maintain good associations, she dates a married man. (Tr. 995).
Penelope Vlahopoulos, defendant's mother, testified via an interpreter provided by the defense. She stated that there is a business dispute between defendant and the father of one of the complainants.She also stated that other family members were also present when defendant and his sixteen year-old niece went out. During this testimony, the trial judge remarked that the interpreter and the witness were speaking to each other after each question and he therefore declared that a true translation was not being undertaken. The interpreter explained to the judge that the witness had questions regarding the trial questions. (Tr. 1010-1012). The questioning of Mrs. Vlahopoulos was then terminated shortly into the state's cross-examination.
Anna Collins testified that she met defendant in May 1999 and moved into his apartment in June 1999. She stated that she was present when the twenty year-old niece twisted her ankle but she claimed that this occurred in the apartment, not at the Tick Tock Tavern. Collins denied that the complainants consumed alcohol with defendant.
The matter was then submitted to the jury. Defendant was acquitted of one of the charges of raping the twenty year old niece, but convicted of all remaining charges.
The matter then proceeded to trial on the repeat violent offender and sexually violent predator specifications. Defendant's former wife, Laurine Nichols, testified that on October 31, 1990, she went to sleep early. Defendant then awoke her and gave her something to drink. Later, she was awakened by the screams of her eleven year-old daughter who was in the bathroom, bleeding profusely from her genital area. As Nichols prepared to take the girl to the hospital, defendant told her that he had harmed the girl with his hand. Nichols became hysterical and defendant grabbed a gun which the couple kept at the apartment. Nichols subsequently obtained the gun and later brought the girl to the hospital. Nichols further testified that two surgeries were needed to repair the harm done to the girl. Medical records of the incident compare the harm done to the girl to an episiotomy or surgical procedure sometimes done to facilitate childbirth.
The state also demonstrated that defendant ultimately pled guilty to one count of felonious assault in connection with this incident. It was further established that defendant was initially given probation but later violated the terms of probation and was sentenced to prison in 1995. He ultimately received shock probation, however.
Defendant testified on his own behalf. He denied harming the girl and claimed that a male friend of his wife's had actually hurt her. Defendant also claimed that the child stated that her mother abused her. Defendant maintained that he plead guilty to felonious assault only because he was advised to do so.
The jury convicted defendant of both specifications and on June 16, 2000, the trial court sentenced defendant to nine years incarceration on each of the rape counts (Counts One, Three, Four, Five, and Six), and seven years on both of the corruption counts (Counts Seven and Eight). The trial court further ordered that all sentences run consecutively for a total sentence of fifty-nine years. Defendant now appeals and assigns five errors for our review. For the sake of convenience we shall address the assignments of error out of their predesignated order.
Defendant's first assignment of error states:
 APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, GUARANTEED BY THE UNITED STATES CONSTITUTION, AMENDMENTS VI AND XIV, AND OHIO CONSTITUTION, ARTICLE I, SECTION 10, DUE TO A CONSTITUTIONALLY DEFICIENT PERFORMANCE BY HIS ATTORNEY RESULTING IN PREJUDICE, AND DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, GUARANTEED BY THE UNITED STATES CONSTITUTION, AMENDMENTS VI AND XIV, AND OHIO CONSTITUTION, ARTICLE I, SECTION 16, AS A RESULT OF PROSECUTORIAL MISCONDUCT IN QUESTIONING WITNESSES AND CLOSING ARGUMENT.
In this assignment of error, defendant asserts that the prosecuting attorney engaged in misconduct and that his trial attorney was ineffective.
A. PROSECUTORIAL MISCONDUCT
In evaluating a claim of prosecutorial misconduct, we must determine whether, absent the improper questions or remarks, the jury still would have found the defendant guilty. State v. Maurer (1984), 15 Ohio St.3d 239,266; State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209, 219, 71 L.Ed.2d 78, 102 S.Ct. 940.
The test regarding prosecutorial misconduct in closing argument is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v. Smith (1984),14 Ohio St.3d 13, 14. Closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial. State v. Mann (1993), 93 Ohio App.3d 301, 312. A prosecutor is afforded wide latitude in closing arguments, State v. Jacks (1989), 63 Ohio App.3d 200, 210, and it is within the trial court's sound discretion to determine if a prosecutor has gone beyond the bounds permitted. State v. Benge (1996),75 Ohio St.3d 136. A judgment will not be reversed if it is clear beyond a reasonable doubt that, absent the prosecutor's remarks, the jury would have found the defendant guilty. State v. Loza (1994), 71 Ohio St.3d 61,78.
Defendant maintains that the prosecuting attorney engaged in several instances of misconduct, and we shall consider each one separately. Defendant asserts that prosecuting attorney committed misconduct by eliciting testimony that defendant physically abused his former wife. We note that this evidence was relevant to the issue of force and the girl's belief that she had to listen to her uncle. This claim is therefore without merit.
Defendant also asserts that the prosecuting attorney committed misconduct by presenting evidence of unrelated charges involving a three-year-old girl and by questioning defendant's son as to whether defendant had arranged for the boy to have sex with his girlfriend. The defendants' witnesses testified that defendant's home was a stable place where the family met. They claimed that the cousins occasionally smoked marijuana there, unbeknownst to the defendant. The prosecuting attorney was therefore permitted to present evidence to impeach these claims.
Defendant next asserts that prosecuting attorney committed misconduct by questioning defendant's daughter about the allegations of sexual abuse that she had made eight years earlier and regarding whether she was dating a married man. These questions were fair cross-examination impeachment of Buckner's claim that defendant considered himself the moral arbiter of the family and this was the basis of his conflict with one of his nieces. Indeed, the whole theory of the defense was that defendant was not the sort of man who would have engaged in such conduct.
Defendant next asserts that the prosecuting attorney committed misconduct by challenging the accuracy of a defense interpreter. The record indisputably demonstrates that the interpreter and the witness engaged in exchanges prior to the delivery of the final answer to the question. The interpreter admitted that this was the case. (Tr. 1010-1012). To permit the interpreter to present anything other than an as near as possible word-for-word translation is actually a kind of hearsay. The prosecuting attorney did not commit misconduct in questioning the validity of the translation.
Defendant next asserts that the prosecuting attorney committed misconduct by appealing to larger societal problems within her closing argument. We note that there was no objection to this comment and further note that the reference to the Jerry Springer Show was in fact a comment upon the allegations which the state sought to prove. (Tr. 1046). A second reference to societal problems was offered as an explanation as to why the parents of defendant's twenty year-old niece had tried so hard to keep her sheltered from the world. (Tr. 1047). Neither of these remarks is prejudicial.
Defendant additionally asserts that the prosecuting attorney committed misconduct in expressing her own views regarding the credibility of defendant's evidence during closing argument. This comment is actually a fair comment on the testimony of the sixteen year-old as to her efforts to come to Cleveland, and there can clearly be no prejudice to the defendant. (Tr. 1063). As to the prosecuting attorney's comment in closing argument that defendant's son Alex would be a future defendant, we find that it was improper but also find that in light of Alex's admitted legal problems, this remark was harmless beyond a reasonable doubt.
Finally, as to the statement that the prosecutor believed the twenty year-old, we note, infra, that this court is hereby reversing that portion of the conviction, so no prejudice has occurred. Moreover, we note that the jury was repeatedly informed that the arguments of counsel were not evidence.
In accordance with the foregoing, this portion of the first assignment of error is without merit.
B. INEFFECTIVE ASSISTANCE OF COUNSEL
In order to establish a claim of ineffective assistance of trial counsel, it is clear that a defendant must make a two-part showing:
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington (1986), 466 U.S. 668, 687. Accord State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. The Strickland court also cautioned courts examining the issue that:
 [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134(1982). * * * Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'
Id., at 689. See, also, State v. Frazier (1991), 61 Ohio St.3d 247,253. Debatable trial tactics do not constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49.
Appellate counsel, in his brief, argues that a careful and rigorous reading of the record, "* * * discloses errors by counsel that cannot be attributed to any reasonable trial strategy." We have reviewed the record and find that this is not so. The defense strategy was to win it all. The defense strategy was to attempt to show that the accusations were all a pack of lies, that there was no truth to the charges, no sex, no cocaine. The defense strategy was to rely on the credibility of the defendant and to undermine the credibility of his accusers.
Appellate counsel points out several instances where trial counsel failed to object. Trial counsel, it is asserted, failed to object to some of the evidence offered by the state; failed to review a witness's statement prior to cross-examining her; failed to object to hearsay offered by Christine Oravec; failed to object to Oravec's assertion that she believed the charges were credible; failed to object to other inflammatory and irrelevant evidence offered by the investigating officers; failed to discuss with defendant whether the sexually violent offender specification would be tried to the court or to the jury; and failed to renew his motion for acquittal at the close of the evidence.
This court notes, as did trial counsel, that there was no physical evidence of any crime. No guns or cocaine were found in Defendant's apartment. The State's entire case relied on the accusations of the two young women. The defense strategy was to show that the accusations arose out of a family dispute and were followed by a biased investigation.
For example, the State's theory on some of the charges is that one niece came up regularly from Baltimore to be raped by her uncle — an accusation that put her credibility on the line. Although appellate counsel claims trial counsel was ineffective for asking Parker whether she had taken defendant's statement, (causing her to then comment that defendant had invoked his constitutional rights) we cannot conclude that trial counsel erred in this connection. This question was part of defendant's trial counsel's overall strategy of disparaging the efforts which the police undertook in investigating this matter, and characterizing it as simply adopting the statements of the nieces as true.
The defense strategy in this case was to focus on credibility, and while matters that might ordinarily have been objected to were permitted into evidence, they all appear to have been admitted to maintain that focus. The court notes that trial counsel did object to some matters, those which would create such a focus.
To be sure, the credibility defense did not work as well as defendant had hoped. While it may appear in hindsight to have been a miscalculation to admit such evidence without objection, this is not the standard for ineffective assistance of counsel. That the jury did weigh and consider the credibility of the witnesses is indicated by the not guilty verdict on count two, but it appears that on the other counts, the jurors found the young women to be more credible.
Appellate counsel further argues that the trial attorney failed to discuss with defendant whether the sexually violent offender specification would be tried to the court or to the jury. The record indicates that during the voir dire of the jury, the trial court mentioned the repeat violent offender specification in front of the jury and defendant's trial counsel asked for a mistrial. This motion was granted and the trial court seated a new panel. (See Tr. 60). Thereafter, the trial proceeded upon that basis and no evidence was offered concerning defendant's prior conviction. As defendant's case began, however, the record indicates that defendant's counsel again discussed the matter with defendant and then informed the court that defendant wanted the specification tried to the jury. (Tr. 879-880). We further note that by proceeding in this fashion, defendant's trial counsel kept this information out of the entire first portion of the trial. This claim of ineffective assistance therefore lacks support in the record.
As to whether trial counsel erred in failing to renew the motion for acquittal at the close of the case, this court has, in its review of the fourth assignment of error, undertaken its own review of the sufficiency of the evidence and this claim is therefore moot. See infra.
This portion of the first assignment of error is without merit.
The first assignment of error is overruled.
Defendant's fourth assignment of error states:
 THE EVIDENCE ON THE MERITS WAS INSUFFICIENT AND THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Defendant asserts that his convictions are supported by insufficient evidence and are against the manifest weight of the evidence. These are two different standards.
A. SUFFICIENCY
In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court stated:
 Sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. Blacks Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is legally insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia(1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
In State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, the Court described the role of the appellate court in reviewing a challenge to the sufficiency of the evidence supporting a conviction.
 An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
At paragraph two of the syllabus, citing Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 520.
As noted previously, the state alleged that defendant committed rape in violation of R.C. 2907.02(A)(1)(a) which provides as follows:
 (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 (a) For the purposes of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug or intoxicant to the other person, surreptitiously or by force, threat of force, or deception;
Thus, in order to establish rape pursuant to this division, the offender must administer a drug or intoxicant to the victim surreptitiously, by force, threat of force or deception which substantially impairs the victim's judgment or control. State v. Morris (March 9, 2001), Montgomery App. No. 18321, unreported.
Here, with regard to Count One, the state maintained that defendant raped his twenty year-old niece in violation of this subsection. We note, however, that the evidence demonstrated that, following the first instance when defendant obtained a fruity drink for her, and she did not know what it was, defendant later touched her breasts and touched her in her vaginal area. This evidence was insufficient to establish penetration and does not establish rape. State v. Wells (2001), 91 Ohio St.3d 32. Further, with regard to Count Two, the state failed to prove that during the subsequent incidents the woman did not know what she was consuming. Similarly, there was no evidence of any other intoxicant being surreptitiously added to the alcoholic drinks that she knowingly consumed on the later occasions, and there was no evidence that she was forcibly given any substance prior to the occurrence of sexual conduct. We therefore reverse defendant's convictions pursuant to Counts One and Two.
With regard to defendant's convictions for raping the sixteen year-old niece, we note that in State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph one of the syllabus the Supreme Court held as follows:
 The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.
Later, in State v. Schaim (1992), 65 Ohio St.3d 51, paragraph one of the syllabus, the Supreme Court considered force in the context of a pattern of incest between a father and his twenty-year-old daughter. In finding that the state did not prove the elements of forcible rape, the court held:
 "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her.
In this instance, the state demonstrated, that defendant took her to the tavern and ordered her a Fuzzy Navel, which he called a very light drink. (Tr. 607). She stated that the drink tasted good and that she was curious about alcohol so she drank six or seven drinks and became intoxicated. Defendant later parked behind a building. He inserted his penis into her and she did not have enough strength to push him off. Defendant subsequently told her that if she told anyone he would harm her family. While this evidence may establish rape by force, this evidence does not establish the offense as charged because the girl knowingly and voluntarily consumed the intoxicant.
The state's evidence further indicated that the next day, she agreed to go out with defendant again because she was afraid. He gave her cocaine, telling her to take it and insisting that it was good, pure, like aspirin, and would give her energy. There was no sexual conduct on this night. Accordingly, we must hereby reverse defendant's conviction pursuant to Count Three.
With regard to the April 1998, allegation in Count Four, the state's evidence demonstrated that defendant picked her up from the airport and took her to a hotel, gave her cocaine and they engaged in sexual intercourse. The girl testified that she was scared and did as he told her. (TR. 643). She also believed that the experience would be more painful without the drug. (Tr. 643, 662). Defendant told the girl that he is powerful and that he would take care of people and she therefore feared for her family. (Tr. 644). This evidence, if believed, would convince the average mind of the defendant's guilt of the offense beyond a reasonable doubt. This conviction is supported by sufficient evidence.
With regard to Count Five, concerning the allegations pertaining to June and July 1998, the state demonstrated that defendant and the girl decided that she would work in Cleveland for the summer and she stayed at the Franklin Avenue home. Over the next eight weeks, she consumed cocaine with defendant approximately forty times and that following almost all of these instances, they engaged in sexual acts. In light of the girl's testimony concerning defendant's previous threats, and the painful nature of the experience, a threat of force can be inferred from the circumstances surrounding sexual conduct. This evidence, if believed, would convince the average mind of the defendant's guilt of the offense beyond a reasonable doubt. This count is supported by sufficient evidence.
With regard to Count Six, the evidence demonstrated that the girl once again returned to Cleveland for Easter in 1999. Defendant gave her cocaine five days per week and also gave her alcohol and they engaged in oral and anal sex. At around this time period, defendant told the girl that one of her male friends would be found in a body bag if she told anyone. A threat of force can therefore be inferred from the circumstances surrounding sexual conduct. This evidence, if believed, would convince the average mind of the defendant's guilt of the offense beyond a reasonable doubt and this conviction is supported by sufficient evidence.
The state further alleged that defendant corrupted his nieces with drugs in violation of R.C. 2925.02 which provides:
(A) No person shall knowingly do any of the following:
 (1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance;
* * *
(4) By any means, do any of the following:
 (a) Furnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard;
In this instance, with regard to Count Seven, the state presented evidence that in June of 1999, as they were preparing to go out, defendant called the twenty year old niece into his bedroom, offered her cocaine and gave her a straw. She refused the cocaine for twenty minutes, but she felt extremely pressured. Defendant told her that they were not leaving until she consumed the cocaine, then he grabbed her arm and showed her how to snort it. She stated that she snorted it so that they could leave (Tr. 410), and that she listened to her uncle and did not question him. (Tr. 413). This evidence, if believed, would convince the average mind of the defendant's guilt of the offense beyond a reasonable doubt and this count is supported by sufficient evidence.
Finally, with regard to Count Eight, the state presented evidence that defendant drove to a dark alley, gave her cocaine, showed her how to do it and told her that it would make her feel better. She did not want the drug, but he insisted and she snorted the cocaine. This evidence, if believed, would convince the average mind of the defendant's guilt of the offense beyond a reasonable doubt and Count Eight is accordingly supported by sufficient evidence.
In accordance with all of the foregoing, this portion of the assigned error is well-taken in part.
B. MANIFEST WEIGHT
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court set forth the role of an appellate court in determining whether a judgment is against the manifest weight of the evidence:
 When a court of appeals reverses the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a thirteenth juror and disagrees with the fact finder's resolution of the conflicting testimony. Tibbs [v. Florida(1982), 457 U.S. 31,] at 42, 102 S.Ct at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should only be granted in the exceptional case in which the evidence weighs heavily against the conviction.
Moreover, the credibility of witnesses and the weight attributable to their testimony are primarily matters for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Applying the foregoing to this matter, we are unable to conclude that the jury clearly lost its way and created such a manifest miscarriage of justice in this instance. The state presented evidence which was clear, detailed, and consistent. The evidence offered by defendant was directly contrary. Simply put, the jury could not have believed both defendant and his nieces. If, however, the jury believed the nieces, as they apparently did, there is more than enough evidence to convict. The convictions are not against the manifest weight of the evidence.
The fourth assignment of error is well taken in part and defendant's convictions pursuant to Count One, Count Two and Count Three are hereby reversed.
Defendant's second assignment of error states:
 THE TRIAL COURT ERRED IN DEFINING THE ESSENTIAL ELEMENT OF FORCE FOR THE JURY THEREBY DENYING APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL.
Defendant contends that the trial court erred with regard to its instructions pertaining to the charges that defendant raped his twenty year old niece by giving the jury the force instruction derived from State v. Eskridge (1988), 38 Ohio St.3d 56, and according to the Supreme Court's decision in State v. Schaim (1992), 65 Ohio St.3d 51, this instruction does not apply where the alleged victim is an adult.
Because we have reversed defendant's conviction for the rape of the twenty year old niece, pursuant to Count One, and Count Two, this assignment of error is moot. App.R. 12(A)(1)(c).
Defendant's third and fifth assignments of error are interrelated and state:
 THE TRIAL COURT'S JURY CHARGE ON THE SEXUALLY VIOLENT PREDATOR SPECIFICATION OMITTED A DEFINITION OF AN ESSENTIAL ELEMENT THEREBY DENYING APPELLANT DUE PROCESS OF LAW, AND THE EVIDENCE SUBMITTED BY THE PROSECUTION ON THE SEXUALLY VIOLENT PREDATOR SPECIFICATION WAS ADMITTED IN VIOLATION OF THE RULES OF EVIDENCE.
 APPELLANT'S CONVICTIONS OF THE SEXUALLY VIOLENT PREDATOR SPECIFICATIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.
Defendant asserts that the trial court erred in failing to instruct the jury that in order to convict defendant of the sexually violent predator specification, the accused must be convicted of a sexually violent offense. Defendant concedes, however, that a rape conviction would, therefore, satisfy the first essential element of a sexually violent predator specification.
He further complains that the state presented irrelevant and prejudicial evidence that defendant abused his wife, carried a gun, stalked his family, did not pay child support, and did not allow his wife to obtain medical treatment for their daughter following the 1991 incident. Finally, he asserts that the state failed to prove beyond a reasonable doubt that he is likely to engage in one or more sexually violent offenses in the future.
Pursuant to R.C. 2971.01(H)(1), a sexually violent predator is defined as "a person who has been convicted of or pleaded guilty to committing, on or after the effective date of this section, a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses."
As to the first part of this determination, we note that a "sexually oriented offense" includes felonious assault if committed for sexual gratification. R.C. 2950.01(D)(3); See State v. Childs (April 19, 2001), Cuyahoga App. No. 78076. The issue of whether or not an assault is classified as one which was committed with a purpose to gratify the sexual desires of the offender is a question of fact which rests upon the unique facts and circumstances of each offense. State v. Slade (Dec. 28, 1999), Franklin App. No. 98AP-1618, unreported. The jury was properly instructed that it had to make this determination in this instance and defendant's claims to the contrary are completely without merit. See Tr. 1182. This portion of the fifth assignment of error is without merit.
As to the second portion of this determination, whether the defendant is likely to engage in the future in one or more sexually violent offenses, the jury may consider the six factors set forth in R.C.2971.01(H)(2):
 (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
 (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
 (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
 (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
 (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
(f) Any other relevant evidence.
Thus, pursuant to Evid.R. 402, evidence going to these or other issues which is relevant to the issue of whether defendant is likely to engage in the future in one or more sexually violent offenses is relevant and therefore admissible.
In this instance, the state presented evidence that in 1990, defendant severely injured his eleven year-old daughter in her vaginal area. This injury required two corrective surgeries.
The state further presented other evidence that defendant thwarted his ex-wife's initial efforts to obtain treatment for the girl. This evidence was relevant to the issue of the likelihood that defendant would commit future offenses because it manifested a pattern of control and force over the family. It was therefore properly admitted.
The state also demonstrated that from 1997 through 1999, defendant had sexual contact or sexual conduct with his nieces after giving them cocaine and or alcohol. The state's evidence, if believed, supports the sexually violent predator specification beyond a reasonable doubt. The specification is supported by sufficient evidence and we therefore conclude that the third assignment of error is without merit.
Moreover, we note that the trial court did not, after finding defendant to be a sexually violent predator, impose a life sentence, pursuant to R.C. 2971.03 so any error which may have conceivably occurred in connection with the trial court's hearing was not prejudicial.
The third and fifth assignments of error are without merit.
The judgment of the trial court is reversed as to defendant's convictions pursuant to Count One, Count Two and Count Three. The matter is affirmed as to all remaining counts and their specifications and is remanded for re-sentencing.
It is ordered that appellee and appellant split the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, P.J., AND FRANK D. CELEBREZZE, JR., J., CONCUR.